IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION | : : : | CIVIL ACTION |
| v. | : : | |
| CIRCUIT CITY STORES, INC. | : : | NO. 07-CV-4006 |

MEMORANDUM

AND NOW, this   5th   day of September 2008, upon consideration of Defendant's Motion for Partial Summary Judgment (Doc. No. 28), Plaintiff's Response in Opposition (Doc. No. 33), and Defendant's Reply (Doc. No. 36), it is hereby ORDERED that Defendant's Motion is DENIED.

I.   FACTUAL BACKGROUND

Plaintiff Equal Employment Opportunity Commission ("EEOC") brings this suit against defendant Circuit City Stores, Inc. ("Circuit City") on behalf of charging parties Christopher Snow ("Mr. Snow"), Jamal Booker ("Mr. Booker"), Robert Taylor ("Mr. Taylor"), Maurice Jones ("Mr. Jones"), Brian Corado ("Mr. Corado"), Damond Jackson ("Mr. Jackson"), Keith Murphy ("Mr. Murphy"), Lester Duncan ("Mr. Duncan"), and Jason Fornito ("Mr. Fornito") (collectively, "charging parties").  In its complaint, plaintiff alleges that defendant — via its management-level employee Michael Groden ("Mr. Groden") — engaged in sexual harassment, constructive discharge, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.*

In June 2005, Mr. Groden was promoted to store manager of defendant's Springfield, Pennsylvania store, where all of the relevant conduct in this case occurred.  Since that time,

multiple employees working at the Springfield store were allegedly subjected to various sexually-charged comments and unwelcome physical touching by Mr. Groden. Plaintiff's evidence of such conduct consists of the following:

    1. Christopher Snow: Mr. Snow was a part-time Entertainment Associate at Circuit City's Springfield store when Mr. Groden became Store Manager. Mr. Snow testified that during the course of his employment, Mr. Groden said "b---s" and "b---s in your mouth"[1] to him and a coworker, Robert Taylor. (Christopher Snow Dep. 187:2-188:15, Feb. 1, 2008.) Mr. Snow also testified that Mr. Groden shook his hand and tickled his palm with his middle finger, a gesture which Mr. Snow interpreted as having sexual overtones.[2] (Id. 324:20-326:13.) After the first time this occurred, Mr. Snow pulled his hand away and warned Mr. Groden not to do it again since he "felt as if it was a sexual advance from another man." (Id. 326:4-5.) He also reported the incident to Daniel Poole, another manager in the Springfield store, but no concrete action was taken. (Id. 326:18-328:1.)

    Soon after, Mr. Groden tickled Mr. Snow's hand a second time in the presence of several customers, at which point Mr. Snow "snatch[ed] [his] hand back," cursed at Mr. Groden, and yelled, "I told you don't ever do that s--- again." (Id. 328:6-19.) Mr. Groden responded, "If you don't like it, you can clock out." (Id. 329:3-7.) Mr. Snow claims that in the two weeks to a month that followed, Mr. Groden drastically cut his work hours in retaliation for rejecting his advances and reporting his conduct, such that Mr. Snow was ultimately forced to resign. (Id.

---

[1] Both of these comments make reference to the male genitalia.

[2] This particular type of handshake has been understood to have some sexually-suggestive connotations.

237:7-238:7.)³

    2. Jamal Booker: Mr. Booker worked as a Warehouse Associate under Mr. Groden. Mr. Booker testified that Mr. Groden twice made the comment "b---s in your mouth" to him, both times when the two were alone and Mr. Groden was on his way out of the room. (Jamal Booker Dep. 328:12-330:5, Mar. 3, 2008.) The two comments occurred about one month apart. (Id. 331: 16-19.) According to Mr. Booker, he interpreted the comments as Mr. Groden "want[ing] to have — that's a sexual act, oral sex, male on male." (Id. 330:23-331:4.) Mr. Booker did not complain to anyone at Circuit City, however, because "[he] didn't know who to complain to." (Id. 332:6-11.) Mr. Booker further testified that Mr. Groden engaged in "constant rubbing of men's shoulders and [] constant tickling of men's palms. . . . He'd walk up behind you and put his hands on your shoulders . . . ." (Id. 333:23-334:11.) He stated that Mr. Groden attempted to

---

³Defendant has apparently moved for summary judgment as to all charging parties with the exception of Mr. Snow. (Def.'s Memo. at 1-2.) However, pursuant to the titled caption of this lawsuit, the Court understands this case as having been brought by only one independent plaintiff, the EEOC, albeit on behalf of multiple charging parties. See EEOC v. Waffle House, Inc., 534 U.S. 279, 291, 296 (2002) (reiterating that 42 U.S.C. § 2000e, which statutorily grants the EEOC the right to bring an independent cause of action, "makes the EEOC the master of its own case and confers on the agency the authority to evaluate the strength of the public interest at stake") ("[P]ursuant to Title VII . . . , whenever the EEOC chooses from among the many charges filed each year to bring an enforcement action in a particular case, the agency may be seeking to vindicate a public interest, not simply provide make-whole relief for the employee, *even when it pursues entirely victim-specific relief*") (emphasis added). See also EEOC v. Frank's Nursery & Crafts, Inc., 177 F.3d 448, 468 (6th Cir. 1999) (holding that the EEOC may seek relief that protects a class of persons from discrimination "upon proof even of just one instance of discrimination that violates Title VII"); EEOC v. Novartis Pharms. Corp., 2007 U.S. Dist. LEXIS 72831, *13 (W.D. Pa. Sept. 28, 2007). Given that none of the individual charging parties are named plaintiffs to this action, we view only the causes of action — and not the alleged conduct — as severable. Accordingly, while each individual's allegations may be referenced for the purpose of determining damages and the sufficiency of plaintiff's evidence *in toto*, they may not be properly analyzed as independent claims subject to summary disposition. We therefore consider all of the alleged conduct in the aggregate in assessing defendant's summary judgment motion.

massage his shoulders between one and five times during his six-month term of employment, sometimes in the presence of other employees or customers. (Id. 334:12-335:16, 337:1-9.) Additionally, he testified that Mr. Groden once made a sexually-charged remark about a female employee's breasts. (Id. 327:15-17.)

On January 15, 2006, Mr. Booker was talking to coworker Louie Dell'Arciprette ("Mr. Dell'Arciprette") at the entrance to the warehouse when Mr. Groden walked by, "grabbed [Mr. Booker's] hand and tickled the inside of [his] palm." (Id. 322:2-4.) Mr. Booker stated that he felt "[e]mbarrassed, humiliated" at the time and commented loudly to Mr. Dell'Arciprette that Mr. Groden "is some type of homosexual, he has a problem," at which point Mr. Groden asked Mr. Booker to repeat his comment. (Id. 322:5-10, 326:13-17.) Upon doing so, Mr. Groden "laughed and [] smirked" and then left. Mr. Booker proceeded into the warehouse area where, minutes later, Mr. Groden returned, asked him what was wrong, and then "reached out and grabbed [Mr. Booker's] shoulders, and [] real close to the side of [his] head," said "[W]hat's wrong with you, Jamal." (Id. 322:21-333:2.) Mr. Booker responded, "[G]et the f--- off me, don't touch me." (Id. 323:2-4.)

At that point, Mr. Groden's demeanor apparently changed and he asked Mr. Booker to clean up some inventory totes in the warehouse. Mr. Booker refused because he "didn't know what to do with them" and because the individual typically responsible would soon be arriving. (Id. 323:5-15.) Mr. Groden then pointed to some small scraps of paper on the floor and told Mr. Booker to pick them up, at which Mr. Booker again refused, purportedly because "that meant I would have to bend down in front of him to pick up the papers," which he was uncomfortable doing since "[Mr. Groden] already made homosexual advances towards [him]." (Id. 323:16-22,

4

325:7-15.) Mr. Groden then proclaimed, "[W]ell, if you don't want to do that, that means you don't want to work here anymore." (Id. 323:23-324:2.) When Mr. Booker protested and began cursing, Mr. Groden said, "I'm going to clock you out and send you home because you don't want to work." (Id. 324:19-325:1.) Mr. Booker then took off his Circuit City vest and declared that he was quitting his job. (Id. 325:1-3.)

      3. Robert Taylor: Mr. Taylor, a part-time Entertainment Associate, testified that Mr. Groden tickled the palm of his hand twice after becoming Store Manager. (Robert Taylor Dep. 39:12-41:16, Aug. 15, 2008.) The first incident occurred in approximately September 2005. Mr. Taylor interpreted the handshake as a "sexual gesture" because "that handshake insinuate[s] that he wants to have sex with you. . . . It's just a come-on for whoever, that you want to have sex with somebody." (Id. 42:13-17, 43:16-19, 51:8.) Following the incident, Mr. Taylor "kind of blew up at [Mr. Groden]" to "let him know he can't be shaking [his] hand like that." (Id. 44:6-10.) He also reported the conduct to Daniel Poole, who apparently responded that he could do nothing about it since Mr. Groden was his boss. (Id. 52:1-6.) Soon after, Mr. Taylor's hours were cut from 20-35 hours per week to 12-15 per week. (Id. 47:6-14.) In December 2005, Mr. Groden tickled Mr. Taylor's palm again. Mr. Taylor responded this time by telling Mr. Groden that "[he] didn't want [Mr. Groden] anywhere near [him]." (Id. 66:4-68:1.)

      Mr. Taylor testified that he often witnessed Mr. Groden inappropriately touching other Circuit City employees while they were working. He stated that he personally observed Mr. Groden "grab[] Neil [Farwell's] penis" in the television department, and he also saw Mr. Groden "grab[] Jason Fornito's buttocks" while on the store floor. (Id. 72:19-74:17, 77:7-11.) He observed Mr. Groden giving shoulder massages on a daily basis to almost all of the male

employees in the store, and tickled the palms of at least 15, including Mr. Snow, Mr. Dell'Arciprette, Mr. Jones, Paul Hagan, and Tremaine Jeffers.  (Id. 81:4-85:22.)

4. Maurice Jones: Mr. Jones, a Warehouse Associate, likewise stated that Mr. Groden "shook [his] hand and tickled the inside of [his] palm with his finger" on or about August 2005.  (Maurice Jones Aff. ¶ 6, Aug. 13, 2008.)  Mr. Jones pulled his hand away and told Mr. Groden not to do it again.  Mr Groden laughed in response.  In September 2005, Mr. Groden tickled Mr. Jones' palm again, this time in the presence of Christopher Snow.  (Id. ¶¶ 6, 8.)  Mr. Jones stated that he did not complain about Mr. Groden's conduct "because [he] was afraid of lo[]sing [his] job."  (Id. ¶ 9.)

5. Brian Corado: Mr. Corado worked as a Product Specialist Associate during Mr. Groden's tenure as the Springfield Store Manager.  Mr. Corado stated that sometime in late 2005, Mr. Groden "shook the palm of [his] hand and tickled it with his middle finger," and repeated this conduct a second time thereafter. (Brian Corado Aff. ¶¶ 3-4, Aug. 19, 2008.)  Mr. Groden's handshake "made [Mr. Corado] feel uncomfortable."  (Id. ¶ 5.)  Mr. Corado stated that, on a separate occasion, Mr. Groden walked by him, "started rubbing [his] shoulders and said something [in] his ear" which he could not recall.  (Id. ¶ 9.)  He said that he often witnessed Mr. Groden giving shoulder massages to other employees, including Jason Fornito, during which Mr. Groden would rub the employees' backs and whisper comments in their ears such as "[H]i buddy."  (Id. ¶¶ 6-7.)  Like Mr. Jones, Mr. Corado did not complain about the situation "because [he] was concerned about [his] job."  (Id. ¶ 9.)

6. Damond Jackson: Mr. Jackson, a part-time Warehouse Associate, also stated that Mr. Groden "approached [him] from behind" while he was standing in front of a computer and

"started to massage [his] shoulders." (Damond Jackson Aff. ¶ 10, Aug. 20, 2008.) He stated that he told Mr. Groden not to do it again, but did not complain any further "because [he] was afraid to lose [his] job." (Id. ¶¶ 10, 12.)

      7. Keith Murphy: Mr. Murphy worked for Circuit City as a road shop installer. He stated that, beginning on or about February 2006, Mr. Groden tickled the palm of his hand between six and seven times. (Keith Murphy Aff. ¶ 3, Aug. 26, 2008.) Although Mr. Groden's behavior offended Mr. Murphy and made him feel "uncomfortable," he failed to report it for fear of losing his job. (Id. ¶¶ 4, 7.) Mr. Murphy also stated that he heard Mr. Groden say "b---s in your mouth" on "countless occasions" to several individuals, including Jason Fornito. (Id. ¶ 6.)

      8. Lester Duncan: Mr. Duncan was a sales associate who joined defendant's Springfield store around the time that Mr. Groden became Store Manager. At his deposition, Mr. Duncan testified that although he worked at Circuit City for only three months, he was nevertheless subjected to Mr. Groden's "inappropriate" behavior. (Lester Duncan Dep. 53:15-54:15, June 19, 2008.) Specifically, he stated that on two occasions in September 2005, Mr. Groden gave him "extended hugs" which "[were] inappropriately long for men," both times after Mr. Duncan had made large sales. (Id. 53:15-20.) Also during that timeframe, Mr. Groden tickled the palm of Mr. Duncan's hand twice. Mr. Duncan testified that the first time this occurred, the handshake lasted four or five seconds and he was "offended" because he saw Mr. Groden's behavior as "pretty much an invitation . . . [t]o sex," pursuant to the "common knowledge" interpretation of the handshake. (Id. 57:24-58:6, 71:1-5, 74:2-15.) He stated that Mr. Groden's behavior "made [him] start looking elsewhere for another job," and he "tried to avoid" shaking Mr. Groden's hand thereafter. (Id. 71:3-23.) Despite this, Mr. Groden tickled Mr. Duncan's palm a second

time soon after, after which Mr. Duncan "snatched [his] hand away." (Id. 74:16-75:11.) Ultimately, although he "felt violated" by Mr. Groden, Mr. Duncan did not report his behavior because he did not want to be labeled as a "troublemaker." (Id. 113:7-10.)

The EEOC filed the instant action seeking injunctive relief and money damages on September 25, 2007, more than thirty days after Mr. Snow and Mr. Booker filed individual charges of sex-based discrimination with the EEOC. As stated above, see supra note 1, defendant now purports to move for summary judgment with respect to all charging parties except for Mr. Snow. At this procedural juncture, however, we find it improper to sever the individual allegations and re-characterize this lawsuit as a multi-plaintiff action *sua sponte*. We thus construe defendant's motion as one for summary judgment as to all causes of action, with the facts alleged to be viewed in the aggregate.[4]

## II. LEGAL STANDARD

On a motion for summary judgment, the Court must examine "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits," to determine whether there is any "genuine issue as to any material fact." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In ruling on the motion, the

---

[4]Indeed, in West v. Philadelphia Elec. Co. the Third Circuit Court of Appeals held that a proper hostile work environment analysis "precluded an individualized, incident-by-incident approach." 45 F.3d 744, 756 (3d Cir. 1995) (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.")) "Because a hostile work environment claim is a single cause of action, rather than a sum of discrete claims, each to be judged independently, the focus is [on] the work atmosphere as a whole." Id.

Court must draw all reasonable inferences in the light most favorable to the nonmoving party, and "may not weigh the evidence or make credibility determinations." Boyle v. City of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998); Anderson, 477 U.S. at 255. See id. at 256. Once a moving defendant has demonstrated an absence of genuine issues of material fact, the plaintiff must then establish, through competent evidence, the existence of each element on which he bears the burden of proof. See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990).

III.   DISCUSSION

A.   Sexual Harassment – Hostile Work Environment Claim

In its motion for summary judgment, defendant first argues that the conduct alleged by plaintiff was not sufficiently "severe or pervasive" to rise to an actionable level of hostile work environment. The Supreme Court held in Meritor Savings Bank v. Vinson that, in order to state a claim for hostile work environment, the alleged harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." 477 U.S. 57, 67 (1986) (citing Henson v. Dundee, 682 F.2d 897, 904 (1982)). Such a determination can only be made by looking at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., 510 U.S. 17, 23 (1993). Thus, "isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim." Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

Here, the record amply demonstrates that Mr. Groden's conduct consisted of far more than a few "isolated incidents." Plaintiff submitted evidence from no less than eight individuals, each of whom stated that Mr. Groden subjected them as well as others to unwelcome physical contact — including tickling their palms and massaging their shoulders — and sexually-charged remarks. Mr. Groden was described as having given massages to subordinates on a "daily" basis, (Taylor Dep. 81:4-6), and also engaging in the "constant rubbing of men's shoulders and [] constant tickling of men's palms." (Booker Dep. 333:24-334:2.) Several of the individuals stated consistently that they "often" witnessed such conduct by Mr. Groden, and that his behavior continued from August 2005 through at least February of 2006. (See Jones Aff. ¶ 6; Murphy Aff. ¶ 3.) Indeed, Mr. Groden himself admitted at his deposition that he tickled the palms of "many, many, many, many different people . . . . It's something I do subconsciously. Probably, once again, I did it about thousands or tens of thousands of times." (Michael Groden Dep. 169:22-170:6, 243:5-11.) Such evidence clearly shows that Mr. Groden's inappropriate conduct occurred with great frequency, both time-wise as well as victim-wise.

Plaintiff also submitted evidence as to the remaining Harris factors. Several of the individuals stated that Mr. Groden's physical touching occurred in the presence of others, and Mr. Booker, Mr. Snow, Mr. Taylor, and Mr. Duncan all testified that they felt "uncomfortable," "humiliated," or "embarrassed" by his conduct toward them. (See Booker Dep. 326:17; Snow Dep. 172:6; 181:19; Taylor Dep. 142:22; Duncan Dep. 112:13.) Furthermore, many of the individuals stated that Mr. Groden's behavior unreasonably interfered with their work performance, mostly because they had to avoid interacting with him in the very store that he managed. "[W]hen we walked down the aisles in Circuit City, [] if we spot Michael Groden

coming in our direction, [] we try to avoid him and go the other way because there's no telling what he might try sexually, whether it be the handshake or him trying to rub your shoulders and back." (Booker Dep. 269:2-9.) "I let [Mr. Groden] know, I don't want him anywhere near me. If it doesn't involve anything about work, I don't want to be near him. I don't want to have any conversations with him." (Taylor Dep. 66:16-21.)

Such evidence, viewed in the aggregate, sufficiently establishes that Mr. Groden's conduct was so severe or pervasive as to create an objectively hostile working environment. That all of the allegations were made by individuals working in positions subordinate to Mr. Groden contributes further to our determination. While defendant urges us to evaluate each charging party's factual allegations separately, the Court does not find this to be the appropriate inquiry given the broad "totality of the circumstances" approach mandated by our Court of Appeals. See West v. Philadelphia Elec. Co., 45 F.3d 744, 756-57 (3d Cir. 1995) ("Evidence of harassment of other workers . . . was relevant to an examination of [plaintiff's] claims that he, too was harassed.") See also Velez v. QVC, Inc., 227 F. Supp. 2d 384, 410 (E.D. Pa. 2002) ("Disaggregating claims undercuts the totality of the circumstances inquiry, because it 'robs the incidents of their cumulative effect, and of course, when the complaints are broken into their component parts, each claim is more easily dismissed.'") (quoting Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999)).

Defendant argues, alternatively, that plaintiff's hostile work environment claim fails because it has not established vicarious liability on the part of Circuit City.

> An employer is subject to vicarious liability to a victimized employee
> for an actionable hostile environment created by a supervisor with
> immediate (or successively higher) authority over the employee. When

> no tangible employment action is taken, a defending employer may
> raise an affirmative defense to liability or damages, subject to proof by
> a preponderance of the evidence . . . . The defense comprises two
> necessary elements: (a) that the employer exercised reasonable care to
> prevent and correct promptly any sexually harassing behavior, and (b)
> that the plaintiff employee unreasonably failed to take advantage of
> any preventive or corrective opportunities provided by the employer or
> to avoid harm otherwise. . . .

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  In this case, defendant claims — specifically with respect to Mr. Booker and Mr. Duncan — that it may invoke the affirmative defense because neither individual was subjected to tangible employment action, and because neither individual reported Mr. Groden's behavior through the designated channels provided by Circuit City's Harassment Policy.  (See Def.'s Memo. at 20-21.)

We disagree.  First, as discussed above we do not see how this Court can summarily dispose of "claims" raised by individuals who are not themselves parties to the litigation.[5]  Second, while our analysis does lead us to the conclusion that no tangible employment action[6]

---

[5] We remind defendant that our December 11, 2007 Order specifically denied Mr. Snow and Mr. Booker's motion to intervene in this case, on the grounds that — per defendant's argument — both were bound by their contractual obligations to arbitrate their individual claims in a separate proceeding.  (See Civil Action 07-cv-4006, December 11, 2007 Order.)

[6] An adverse employment action "is one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001) (internal citations omitted).  More specifically, a tangible employment action typically "inflicts direct economic harm" and/or "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761-62 (1998).  Plaintiff urges us to find that Mr. Booker was subjected to tangible employment action when Mr. Groden directed him to pick up small scraps of paper off the floor.  However, we cannot do so under the applicable legal standard, particularly since Mr. Booker conceded at his deposition that Mr. Groden's request was permissible given Mr. Booker's job duties of "[m]aintain[ing] the cleanliness of the warehouse . . . and completing other custodial duties as assigned." (Jamal Booker Dep. 107:8-15, 239:4-22, Mar. 3, 2008.)  Plaintiff makes no claim that Mr. Duncan was subjected to tangible employment

was taken against Mr. Booker or Mr. Duncan, there nevertheless exists a genuine issue as to both prongs of the affirmative defense. It is widely disputed whether defendant "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." <u>Ellerth</u>, 524 U.S. at 765. Several charging parties testified that they complained to Daniel Poole, the Entertainment Manager at defendant's Springfield Store, about Mr. Groden's conduct, but he did nothing about it. (<u>See</u> Snow Dep. 73:13-74:24, 326:14-328:1; Taylor Dep. 39:10-18; 46:8-47:2.) Indeed, Mr. Taylor testified that Mr. Poole took no action even after he himself "witnessed [Mr. Groden's handshakes and massages], not just to [Mr. Taylor], but to a lot of employees." (Taylor Dep. 69:6-70:2.) At his deposition, Mr. Poole denied observing such behavior and stated that he "d[id]n't know" or "d[id]n't recall" whether he received any complaints. (Daniel Poole Dep. 69:18-23, Apr. 17, 2008.) However, he admitted that "if [such complaints] ever happened, [he] would probably have dismissed it" because, in his opinion, the conduct was not particularly serious. (Poole Dep. 64:24-65:16.)

> [Mr. Snow] didn't like Groden very much. . . . And this to me was just another way to complain about Mike [Groden]. And to be honest with you, if a handshake is considered sexual harassment, then I could claim it on a million people. To me it seemed more like a complaint that was just [Mr. Snow] complaining than a serious sexual harassment issue. . . . My opinion is that's not sexual harassment.

(Poole Dep. 67:4-19.)[7]

---

action.

[7]That Mr. Poole may not have received complaints directly from Mr. Booker or Mr. Duncan is of no moment to this Court. The fact that Mr. Poole — as a management-level employee — was aware of Mr. Groden's offending behavior toward employees under his direct supervision is sufficient to raise a genuine issue as to defendant's vicarious liability.

It is also disputed whether, given the circumstances, certain charging parties' failure to take advantage of Circuit City's harassment-reporting channels was unreasonable. See Cardenas v. Massey, 269 F.3d 251, 267 (3d Cir. 2001) (affirming the district court's determination that summary judgment was premature since "[the employee's] reluctance to file a formal complaint for fear of aggravating the situation or branding himself a troublemaker might not have been unreasonable"). Here, the alleged harasser was none other than the Store Manager himself. Mr. Jones, Mr. Corado, Mr. Jackson, Mr. Murphy, and Mr. Duncan all stated that they did not report Mr. Groden for fear of losing their jobs, and both Mr. Taylor and Mr. Snow — the only two individuals who *did* report Mr. Groden — had their hours cut. Based upon this record, and drawing all reasonable inferences in plaintiff's favor, this Court finds that a reasonable jury could conclude that the employees' failure to report was not unreasonable. Defendant is thus not entitled to its affirmative defense at this stage in the litigation.

B.  Constructive Discharge

To establish a constructive discharge claim, a plaintiff must make a further showing than the one required to prove a hostile work environment claim. The Third Circuit directs us to employ an objective test, specifically, "whether a reasonable jury could find that the [employer] permitted conditions so unpleasant or difficult that a reasonable person would have felt compelled to resign." Duffy v. Paper Magic Group, 265 F.3d 163, 167 (3d Cir. 2001) (citing Connors v. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir. 1998)) (brackets in original). In other words, constructive discharge may occur "when the employer is aware that the employee has been subjected to a continuous pattern of harassment and the employer does nothing to stop it." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084-85 (3d Cir. 1996).

As discussed above, plaintiff has presented sufficient evidence demonstrating that a "continuous pattern of harassment" existed in the Springfield store. It has also shown that Mr. Snow, Mr. Booker, Mr. Taylor, Mr. Jackson, and Mr. Duncan all felt forced to resign from Circuit City because they "couldn't stand being around [Mr. Groden] anymore," "w[ere] tired of the situation" with his unwanted physical contact, or because they had "rejected his sexual advances." (See Snow Dep. 312:19-21; Booker Dep. 59:18-23; Taylor Dep. 103:7-9; Jackson Aff. ¶ 14; Duncan Dep. 109:4-11.) Plaintiff also submitted evidence that several employees felt they could do nothing to resolve the situation while still remaining employed. "It was impossible to complain about [Mr. Groden]'s behavior to anybody, other than Dan . . . . [b]ecause [Mr. Groden's] best friend was . . . the human resource representative, the one you would make the complaints to." (Taylor Dep. 97:4-12.) "To me, [complaining to other managers] was, pretty much, just like saying [it] to [Mr. Groden]. And I didn't want any retaliation. . . . I just felt like I would handle it, in my own way; which would be to find a new job." (Duncan Dep. 108:18-109:3.) "This man, Mike Groden . . . if you reject his sexual assault or advance, he will find some way to fire or get rid of you. Make you quit." (Booker Dep. 241:12-15.) Viewing such circumstances objectively, it appears to this Court that a reasonable employee in the charging parties' positions would have felt forced to resign.

Defendant argues that some of these employees were *personally* subjected to Mr. Groden's unwanted touching only once or twice over an extended time period, and thus cannot sustain a constructive discharge claim. Though we acknowledge this point, we do not find it dispositive. The record shows that an atmosphere of sexual harassment permeated defendant's workplace and "made the whole store uncomfortable," such that several of the employees had to

15

go out of their way to avoid Mr. Groden. (Taylor Dep. 52:23, 66:16-21; Booker Dep. 269:2-9.) Moreover, even "a single, non-trivial incident of discrimination may be egregious enough to compel a reasonable person to resign," in which case a plaintiff "may simply face a more difficult burden of proof in establishing the employer's liability" at trial. Duffy, 265 F.3d at 169 n. 2. Where, as here, a significant number of employees were subjected to identical inappropriate contact from the same supervisor, and felt — because of the harasser's particular position in the management hierarchy — that they could do nothing to rectify the situation other than quit, such facts are legally sufficient to establish a constructive discharge claim.

C.      Retaliation

Lastly, we turn to plaintiff's retaliation claim. To establish a *prima facie* case for Title VII retaliation, an employee must present evidence of: (1) protected employee activity; (2) materially adverse action by the defendant employer either after or contemporaneous with the plaintiff's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006). In the instant case, defendant's only contention on plaintiff's retaliation claim is with respect to Mr. Booker, whom it argues was never subjected to any "materially adverse action." We agree. While the bar for establishing adverse action on a retaliation claim is somewhat lower than that on a substantive discrimination claim, see supra note 4, in that the action need only "have dissuaded a reasonable worker from making or supporting a charge of discrimination," Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006), we nevertheless do not find Mr. Booker's evidence to meet that standard. That Mr. Booker was instructed to pick up scraps of paper from the floor — a task which he himself acknowledged

was within his job description — simply cannot constitute adverse action within the context of Title VII.[8]

In spite of this, the Court finds that plaintiff's retaliation claim should go forward. Two other employees, Mr. Snow and Mr. Taylor, both testified that they had their work hours cut after they reported Mr. Groden's behavior to Mr. Poole. In our view, a reasonable factfinder could easily infer such a reduction in hours, under these particular circumstances, to amount to retaliatory adverse action. See Albright v. City of Philadelphia, 399 F. Supp. 2d 575, 587 (E.D. Pa. 2005) (finding that, because a reduction in overtime hours translated into a loss of significant compensation, such a reduction amounted to an adverse employment action). Defendant does not appear to contest this point in its motion. As such, though now armed with quantitatively less evidence, plaintiff's retaliation claim must survive summary judgment.

IV. CONCLUSION

For the reasons stated above, it is hereby ORDERED that Defendant's Motion for Partial Summary Judgment (Doc. No. 28) is DENIED. An appropriate order follows.

---

[8]Mr. Booker seemed to indicate that Mr. Groden only asked him to pick up paper because he wanted to see him to "bend down in front of him." (Jamal Booker Dep. 325:4-10, Mar. 3, 2008.) Assuming this was the case, however, such an act would constitute a continuation of the sexually-based harassment which we discussed in Section III.A, supra, and not a separate retaliatory action. Furthermore, we do not find Mr. Groden's statement that he would "clock [Mr. Booker] out and send [him] home" (Id. 324:23-325:1) — a threat which may or may not have ever been carried out — to constitute materially adverse action. See Nagle v. RMA, 513 F. Supp. 2d 383, 392 n.6 (E.D. Pa. 2007).

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EQUAL EMPLOYMENT | : | |
| OPPORTUNITY COMMISSION | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 07-CV-4006 |
| CIRCUIT CITY STORES, INC. | : | |

<u>ORDER</u>

AND NOW, this   5th   day of September 2008, upon consideration of Defendant's Motion for Partial Summary Judgment (Doc. No. 28), Plaintiff's Response in Opposition (Doc. No. 33), and Defendant's Reply (Doc. No. 36), it is hereby ORDERED that Defendant's Motion is DENIED.

BY THE COURT:

/s/Legrome D. Davis

U. S. District Judge